UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| GEORGE CHOONGO MOONGA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) Case No. 1:17-CV-02136 TWT |
| v. | ) |
| | ) |
| JULIE MOONGA, | ) |
| | ) |
| DEFENDANT. | ) |

FINAL ORDER

Plaintiff George Choongo Moonga ("Father") seeks return of his minor child (hereinafter "N.C.M.") to the United Kingdom pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"). *See* Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670; 22 U.S.C. ҁ 9001 *et. seq.* Father contends that N.C.M. was wrongfully removed from England and brought to the United States by Defendant Julie Moonga ("Mother").

The Hague Convention

This action is brought pursuant to The Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), done at The Hague on October 25, 1980 and the International Child Abduction Remedies Act. The Hague Convention came into effect in the United States of America on July 1, 1988. The objectives of the Convention are as follows: (1) to secure the immediate return of

children wrongfully removed or wrongfully retained in any Contracting States; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States.  Convention, Art.1.

Removal of a child is wrongful where it is in breach of rights of custody attributed to a person under the laws of the State in which the child was habitually resident immediately before the removal or retention and, when the removal or retention occurred, those rights were actually being exercised, Art 3.

Rights of custody include rights relating to care of the child including the right to determine the child's place of residence Art 4.

Except for under very specific circumstances, a child shall be ordered to be returned if less than one year has elapsed from the date of the wrongful removal to the commencement of proceedings, Art 12, Art 13.

The Court is not bound to order the return of a child if there is a grave risk that her return would expose the child to physical or psychological harm or otherwise place her in an intolerable situation, Art 13.

History

Father and Mother married in New York City, New York in the United States of America on May 20, 2005.  The parties moved to the United Kingdom in 2006.  The parties have one minor child as a result of the marriage, N.C.M.,

female, born 2012 (the "child").  The parties moved from the United Kingdom to Singapore in September 2010 where the child was born on August 11, 2012. In September of 2014, the parties and child moved back to the United Kingdom. Both parties were very happy to leave Singapore as their habitual residence. They had no intention to return to Singapore. The parties and child lived in London, the United Kingdom, from 2014 until Mother abducted N.C.M. in March, 2017.

Father is a Solicitor licensed and trained in the United Kingdom.  Father works for Morgan Stanley in London. Father was gainfully employed in London. With Father's law degree, he cannot practice in the United States.  The parties are married. Father is N.C.M.'s father.  He has exercised custody rights over the child as the child's caretaker since birth.  He has been actively involved in all aspects of the child's life. Father's Declaration of Foreign Law, prepared by Sarah Jane Campbell, a family law Solicitor who practices in England and Wales, was admitted without objection, dispute or refutation.

Mother finished her Ph.D. degree in London in 2012 and she continued to receive her education in the United Kingdom by pursuing a Master's of International Business at the University of London. She attended sessions in the United Kingdom while living in Singapore.   Mother was staying home with the

child and, once the child started attending nursery, actively sought employment. Mother pursued a law degree in London, was attending school there and interviewed with a number of law firms. Up until the day of the abduction, Mother was working and attending law school.

N.C.M. attended school in London from 2014 until the day Mother abducted the child to the United States in March, 2017. Both parties selected the child's expensive private school, EIFA in London. The child attended church in London. The child had friends in London. The child was also involved in extra curricular activities including ballet classes, yoga and violin lessons. N.C.M. was thriving in London. Prior to her abduction five months ago, the child had never lived in the United States of America.

<u>Mother's Allegations</u>

In late 2016, Father discussed separation and divorce with Mother. Soon thereafter, on February 6, 2017, Mother took the child to the Portland Hospital, contending that the child had made an outcry that her father had sexually abused her. Once Mother made the claim of sexual abuse, the local police and social services investigated Mother's allegations thoroughly. The child had a child protection medical exam which showed no evidence of sexual abuse. The police and social services interviewed the child, the mother and the father. Despite direct

questioning, the child reported no abuse whatsoever.

Mother disclosed to the social services that she had been sexually abused by both an uncle and a neighbor who had touched her inappropriately. (She denied this at trial.) Further, during the social services assessment, once the police investigation closed, Mother expressed that she did not see any further role for social services. Mother further expressed that she found social services involvement stressful and that she felt that social services was meddling into her family's life.  Father cooperated with the police and social services investigation.

The criminal investigation pertaining to the sexual abuse allegations was closed and Father was not charged.  Rather than continuing with social service's recommendations and follow the requests of the social services, Mother abducted the child to the United States.

Father informed Mother that he would not consent to Mother removing the child from the United Kingdom.  On March 3, 2017, Mother emailed Father that she had removed the child to the United States.

Father filed his Hague Application seeking return of his minor child on March 8, 2017 . Father filed his Petition seeking the child's return on June 13, 2017.

Hague Cases

Mother raised the defense that immediately before the removal of the child "the United Kingdom was not the child's habitual residence." Neither the Convention nor ICARA define habitual residence specifically, but "[c]ourts have been instructed to interpret the expression according to the ordinary and natural meaning of the two words it contains" and decide a child's habitual residence "by reference to all the circumstances" of a particular case ". See <u>Ruiz v. Tenorio</u>, 392 F.3d 1247, 1251 (11 Cir. 2004), also <u>Ovalle v. Perez</u>, # 16-16568 (11 Cir. 2017). Both parties cited <u>Holder v. Holder</u>, 392 F.3d 1009, 1015 (9th Cir. 2004) and <u>Mozes v. Mozes</u>, 239 F.3d 1067, 1071 (9th Cir. 2001) that are referenced in <u>Ruiz v. Tenorio</u> and contain in depth analysis of factors to be considered when determining "habitual residency".

Mother attempted to prove that the parties had a settled purpose/settled intent to create a habitual residency in the United States, where the parties haven't lived in over 11 years and the minor child has never lived, which goes against all facts contained in the testimony and evidence admitted at the hearing on this matter. <u>Mozes v. Mozes</u> at 1075 states that "a settled intent to abandon one's prior residence is a crucial part of acquiring a new one". Further, in <u>Mozes</u> Court emphasized that "education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular

abode. And there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled". *I.d.* at 1074.

Overall, over 11 years has passed since the parties left the United States in 2006.  The minor child has only lived in two places:  Singapore until age two, and London for the rest, a substantial majority, of her life, until Mother abducted her to the United States just four months ago, in March, 2017.   The minor child has never lived in the United States before she was abducted.  *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) found that the fact that a child had never resided in the United States was significant in whether that child could habitually reside here.  In *Ruiz v. Tenorio*, the Eleventh Circuit agrees with the  findings in *Friedrich v. Friedrich* where the child had never lived in the country to which he was removed and he was only removed when the child's parents' marriage disintegrated (similar to the facts of the instant case), even though the court disagreed with the reasoning regarding the parental intent. I.d. Note 3.

As held in *Ruiz v Tenorio*, "'the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence.'" at 12, citing *Mozes* at 1076.

Findings of Fact

I held an all-day evidentiary hearing in this matter on August 7, 2017. Mother and Father were both represented by counsel. Mother and Father both testified as did several other witnesses on behalf of the Father. Extensive documentary evidence was introduced including the investigation by police and social service agencies in the United Kingdom of the Mother's allegations that the Father had sexually abused the child. At the conclusion of the hearing, I ordered N.C.M. returned to the United Kingdom in the custody of the Father. I make the following findings of fact and conclusions of law.

The United Kingdom is the habitual residence of N.C.M.  The parties had a shared, settled intention to abandon their prior habitual residence in Singapore. Both parties had a settled intent to live with the child in the United Kingdom. The United Kingdom  was N.C.M's habitual residence immediately before her removal. Taking N.C.M. out of the United Kingdom would be tantamount to taking her out of the family and social environment in which her life has developed.

The United States has not become N.C.M.'s habitual residence.  She was abducted in March, 2017.  This action was filed just three months later in June, 2017. Less than one year has elapsed from the date of the wrongful removal to the commencement of these proceedings. Mother abduced and wrongfully retained N.C.M. The Mother left in secrecy which is inconsistent with a mutual intent by

the parties for the child to reside in the United States.

At the time of the Mother's removal of N.C.M. Father had and continues to have rights of custody under The Children Act of 1989 (Chapter 41). Parental responsibility is a right of custody under Article Five of the Hague Convention. At the time of Mother's removal of the child, Father was exercising his custody rights within the meaning of Articles Three and Five of the Convention. Mother's removal of N.C.M. was therefore wrongful.

Father never consented to Mother's unilateral decision to abduct and retain the minor child in the United States. Father never acquiesced to Mother retaining the child in the United States from the child's habitual residence of the United Kingdom.

Mother's testimony that the parties planned to live in the United States is found to not be credible. Mother's testimony regarding Father's intent to move to the United States at an undetermined time in the future is not credible.

Grave Risk

The affirmative defense of grave risk of harm requires proof by <u>clear and convincing evidence</u>. 42 U.S.C. § 11603(e)(2)(A); see also *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir.2003). However, Mother did not meet her burden to prove the Grave Risk defense. Once Mother made a claim of sexual

abuse of N.C.M. in London, that claim was thorough investigated and there was no evidence to support the sexual abuse allegations other than Mother's increasingly elaborate and extravagant stories. This Court finds Father's testimony, his total and complete denial, to be more credible.

Order

After hearing the testimony of the parties and witnesses as well as considering all evidence admitted into the record, Plaintiff's Verified Complaint for Return of Child to United Kingdom is hereby granted. N.C.M. is to be returned to the United Kingdom forthwith in the company of Father.

N.C.M.'s passport(s) shall be immediately surrendered to Father.  Mother must surrender the child no later that noon,12:00 p.m. on August 8, 2017 to Father at his counsel's Atlanta office.

Father is ordered to return N.C.M to the United Kingdom.  Mother may fly on the same flight, if she wishes.

Pursuant to Art. 26 of the Hague Convention and 22 U.S.C. §9007, any court ordering the return of the child shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and

transportation costs related to the return of the child, unless the respondent established that such order would be clearly inappropriate. This court reserves the issue of necessary expenses incurred by or on behalf of the petitioner in this action. Father's counsel shall submit a Motion and brief on the above referenced issue within 30 day from the day of this Order and Mother's attorney has an option to submit a response within 30 days from Father's submission of his brief.

SO ORDERED this 10th day of August, 2017, nunc pro tunc to August 7, 2017.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

Prepared and Presented by:

Michael E. Manely, Esq.
Dina R. Khismatulina, Esq.
The Manely Firm, P.C.
121 Martin Luther King Jr., Dr., Suite 430
Atlanta, GA 30303
Phone (770) 421-0808
tmf@allfamilylaw.com
Order Revised by the Court

11